**SO ORDERED.**

**SIGNED this 12 day of May,2016.**

*Stephani W. Humrickhouse*
**Stephani W. Humrickhouse
United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| LINDSEY NAPOLEON<br>DEIDRA SYLVIA NAPOLEON | 14-04454-5-SWH |
| DEBTORS | |

### ORDER ALLOWING OBJECTION TO DEBTORS' EXEMPTIONS

The matter before the court is the objection to certain exemptions claimed by the debtors, filed by Bio-Medical Applications of North Carolina, Inc. ("Bio-Medical"). A hearing was held on March 23, 2016, in Raleigh, North Carolina, and the court took the matter under advisement. Bio-Medical submitted a memorandum of additional authority in support of its objection at that hearing, and on April 6, 2016, the debtors also filed a supplemental memorandum of law. For the reasons that follow, Bio-Medical's objection will be allowed.

### BACKGROUND

From April 2011 through September 2013, the female debtor, Deidra Napoleon, received kidney dialysis treatments from Bio-Medical facilities in Greensboro, North Carolina. The treatments were covered by Ms. Napoleon's health insurer, Anthem Blue Cross and Blue Shield of

Ohio ("Anthem"), pursuant to a policy on which Mr. Napoleon was the primary subscriber. Because Bio-Medical was an out-of-network provider, Anthem's practice was to send reimbursement payments directly to the debtors, who in turn were obligated to then pay Bio-Medical. Specifically, pursuant to an assignment of benefits executed by Ms. Napoleon on April 19, 2011, in favor of Bio-Medical d/b/a Southwest Greensboro (the "Facility"), Ms. Napoleon assigned to Bio-Medical "all healthcare and medical benefits [ . . . ] which are payable for services provided to me by Facility." Bio-Medical's Obj. to Property Claimed as Exempt ("Bio-Medical's Objection") [Docket No. 67] at 2 & Ex. B (the "Assignment of Benefits Form"). On April 4, 2013, Mr. Napoleon executed an agreement with Bio-Medical d/b/a Greensboro Kidney Center, wherein he agreed to "cooperate in seeking, collecting, and paying over to [Bio-Medical] any and all insurance proceeds" with respect to all medical services rendered to Ms. Napoleon. In addition, Mr. Napoleon agreed that "if the insurance proceeds cannot be paid directly to [Bio-Medical]," he would "collect them and pay them over to [Bio-Medical] within five (5) days of receipt." *Id.* at 1-2 & Ex. A (the "Admission Agreement"). There is no dispute with respect to the authenticity of these documents.

   Throughout the spring and summer of 2013, Anthem sent a series of reimbursement checks to the debtors. These were made payable to Mr. Napoleon, who signed some of them over to Bio-Medical, but not all; instead, the debtors deposited multiple checks into their own accounts and used the funds for other purposes. On September 16, 2013, Bio-Medical filed a state court action against both debtors, alleging causes of action for breach of contract and, in the alternative, for unjust enrichment and/or fraud.[1] On January 6, 2014, the state court appointed a receiver to collect future

---

[1] Copies of the state court complaint, the debtors' answer, and other state court documents were appended to Bio-Medical's complaint in the adversary proceeding. *See* Complaint to Determine Dischargeability of Debt, A.P. No. 14-00064-5-SWH [Docket No. 1].

disbursements from Anthem to the debtors. Bio-Medical's Objection at 3 & Ex. C. On February 5, 2014, that court entered partial summary judgment in favor of Bio-Medical on the breach of contract claim in the amount of $29,897.83, "for dialysis services rendered." *Id.*, Ex. D. On July 28, 2014, the state court entered a temporary restraining order enjoining the debtors from transferring any assets to third parties, requiring the debtors to account for the reimbursement checks, freezing the debtors' assets up to the amount of $68,882.26 (representing the sum total of checks that at that time had been issued by Anthem, but not turned over to Bio-Medical), and setting a preliminary injunction hearing for August 5, 2014. *Id.* at 3.

On August 4, 2014, the debtors filed a petition under chapter 13 of the Bankruptcy Code. According to Bio-Medical, the debtors have consistently failed to be forthcoming with regard to their retention and disposition of the proceeds; in particular, they did not include any portion of the reimbursement check funds as income on their statement of financial affairs or in their 2013 and 2014 tax returns. In late September or early October, 2014, Mr. Napoleon received another check[2] from Anthem, in the amount of $1,106.33. On October 16, 2014, the debtors amended their Schedules B and C to claim those funds as exempt. *See* Docket Nos. 19, 20.

On December 15, 2014, Bio-Medical filed a proof of claim for $69,928.59 in the debtors' bankruptcy case. It also initiated an adversary proceeding by filing a verified complaint seeking to

---

[2] In a subsequent filing, the debtors provided a copy of this check and the explanation of benefits ("EOB") notice to which it was attached. The EOB was dated September 29, 2014, and stated that the check was to reimburse for covered services rendered to Ms. Napoleon on April 30, 2013. The EOB's "coding" provided: "SERVICES WERE RENDERED BY A NON-PARTICIPATING PROVIDER. THE ATTACHED CHECK IS TO REIMBURSE FOR THE COVERED SERVICES RENDERED. YOU ARE RESPONSIBLE TO PAY THE PROVIDER." Ex. A to Debtors' Withdrawal of Debtors' Amendments to Schedules A & B Filed October 16, 2014 [Docket No. 30].

declare the debt nondischargeable based on actual fraud under 11 U.S.C. § 523(a)(2)(A) and embezzlement under § 523(a)(4). Specifically, Bio-Medical charged that "as of the date of filing this adversary proceeding, the Debtors have received health insurance reimbursement checks from Anthem BCBS totaling at least $205,352.42. Of that amount, the Debtors have turned over to Bio-Medical $135,423.83, but have failed to remit the 2012-2013 checks and the 2014 Checks, totaling at least $69,928.59." Complaint at 6. That same day, the debtors withdrew their amendments to Schedules B and C, explaining that the funds were no longer available because Anthem had cancelled the September 2014 check and sent the payment directly to Bio-Medical. [Docket No. 30.]

In their answer to the Bio-Medical's complaint, the debtors characterized Bio-Medical's claim as being in the nature of a dischargeable debt for breach of contract. They also asserted counterclaims for violations of the automatic stay based on telephone calls made to them by Bio-Medical representatives during the months of October and November, 2014, as well as Bio-Medical's issuance of billing statements dated November 19, December 3, and December 19, 2014. The parties were able to resolve these issues, and executed a Settlement Agreement and Release (the "Agreement") that was approved by this court on September 9, 2015. The Agreement provides in relevant part:

> 3. <u>Allowed General Unsecured Claim of Bio-Medical</u>. Bio-Medical shall retain an allowed general unsecured claim against the Debtors for the sum of $39,854.80 (the "Amended Claim"). *The Amended Claim shall include the total amount of the Payments intended to cover Deidra Sylvia Napoleon's dialysis treatments at Bio-Medical's facilities between April 19, 2011 and the Petition Date, and exclude any refunds or reimbursements Bio-Medical has received from BCBS to date* (the "Refunds"). Bio-Medical shall amend its claim to make it consistent with the Amended Claim. *In the event Bio-Medical receives additional Refunds in the future, Bio-Medical shall further amend its Amended Claim accordingly.*
> \* \* \*
> 7. <u>Effect of the Agreement</u>. This Agreement is made and entered into between the Parties to 1) *resolve the allegations set forth in the Complaint*, 2) resolve the

>allegations set forth in the Counterclaim, 3) *resolve the treatment of Bio-Medical's Claim in the Bankruptcy Case*, and 4) resolve any and all claims or causes of action arising between the Parties at any time prior to the execution of this Agreement....

Consent Order, Ex. A (Settlement Agreement and Release) [AP Docket No. 20] (emphasis added).

In early 2016, the debtors received two additional post-petition checks (the "Additional Checks") in the amounts of $5,552.88 and $5,531.65, both of which were issued by Anthem to Mr. Napoleon. These are the checks at issue in Bio-Medical's objection to exemptions, because the debtors did not remit the Additional Checks to Bio-Medical: Instead, on February 15, 2016, they filed an amended Schedule A/B to reflect receipt of the Additional Checks and amended their Schedule C to indicate that Mr. Napoleon claimed $4,999 in proceeds from the checks as exempt. Bio-Medical objected, arguing that the debtors "cannot exempt an asset that is not part of the Debtors' bankruptcy estate under 11 U.S.C. § 541." Bio-Medical's Objection at 7. More specifically, Bio-Medical argued that the checks never came into the estate by reason of the assignments executed by both debtors, and noted further that the Agreement executed by the parties should preclude the debtors' effort to exempt these checks. *Id.* at 1-2, 6-9.

In response, the debtors contend simply that the checks are property of the estate, that claiming the exemption is appropriate, and also that the unexpected receipt of the checks "would appear to implicate the strong-arm powers of 11 U.S.C. § 544," such that "the rights of the trustee and other creditors may be implicated as well." [Docket No. 72.] On March 24, 2016, the court entered an order directing the debtors to preserve any and all reimbursement checks received from Anthem, and to turn them over to their bankruptcy counsel to hold in trust pending entry of the court's order resolving Bio-Medical's objection. For the reasons set out below, the court determines that the Additional Checks are not property of the estate. They are the property of Bio-Medical.

**DISCUSSION**

The starting point here is 11 U.S.C. § 541, which provides in relevant part that the "property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case." *See* § 541(a)(1). While the scope of the bankruptcy estate may be "very broad," the fact remains that "the estate's legal and equitable interests in property rise no higher than those of the debtor." *In re Louisiana World Exposition Inc.*, 832 F.2d 1391, 1399 (5th Cir. 1987) (internal quotation and citation omitted). At issue is whether either of the debtors, and thus the bankruptcy estate, have such an interest in the Additional Checks.

**I. Valid assignment precludes insurance proceeds from becoming part of bankruptcy estate**

As Bio-Medical points out, there is ample precedent to the effect that "when a purchaser of an insurance policy assigns its proceeds elsewhere, the assignee or beneficiary owns the proceeds, and the bankrupt's estate does not." *In re Anchorage Nautical Tours, Inc.*, 102 B.R. 741, 744-45 (BAP 9th Cir. 1989); *see also, e.g., Louisiana World Exposition*, 832 F.2d at 1400-01 (emphasizing "the distinction between owning a policy and owning the proceeds," and noting that assignment of insurance proceeds excludes proceeds from estate); *In re Holskey*, 2016 WL 616985 at *5 (Bankr. W.D. Ky. 2016) (debtor may not retain health insurance proceeds when same have previously been assigned to provider of medical care). Bio-Medical argues that the debtors had no ownership interest in the insurance proceeds from the time of the first assignment, and thus also had no enforceable interest at the time they filed their bankruptcy petition – and, that they likewise have no basis upon which to claim an ownership interest in these most recent Additional Checks. To permit the debtors to claim an exemption in the Additional Checks, Bio-Medical concludes, would be "inequitable and unjust."

The court agrees with Bio-Medical. Notwithstanding the debtors' emphasis on the facts that the checks were made out only to Mr. Napoleon, and that Mr. Napoleon executed his assignment of the proceeds over a year after Ms. Napoleon executed hers, it is patently clear that *all* of the insurance proceeds were assigned to Bio-Medical. Ms. Napoleon, as the patient, conveyed to Bio-Medical *all* healthcare and medical benefits payable by reason of medical services it provided to her at the Southwest Greensboro facility. Mr. Napoleon's assignment pertains to her home dialysis treatments, which were facilitated through Bio-Medical's Greensboro Kidney Center. The debtors seem to suggest (without specifically articulating the argument) that the differing dates and circumstances of the two assignments provide a rationale upon which the assignment should fail; and, further, that this would somehow be consistent with Mr. Napoleon claiming ownership of the proceeds, such that he can claim an exemption in them. As best the court can tell, the debtors want the court to infer that Ms. Napoleon, as the patient, lacked the authority to assign the proceeds to Bio-Medical, perhaps because the checks were made out to Mr. Napoleon, as the policyholder. To the extent that this is the debtors' theory, it is implausible.

For one thing, North Carolina state law does not even require that an assignment be written to be valid, or that an assignment take any form in particular. *In re Helms*, 467 B.R. 374, 388-89 (Bankr. W.D.N.C. 2012). Here, however, there are two express assignments, both written, and each assignment establishes in the plainest of terms that each of the debtors agreed that Bio-Medical was entitled to all reimbursement payments made by Anthem in connection with Bio-Medical's provision of medical services to Ms. Napoleon; and, further, that the debtors would affirmatively take the appropriate steps to remit those payments to Bio-Medical. An assignment "is a formal transfer of property or property rights from one person (the assignor) to another (the assignee)."

7

*Alaimo Family Chiropractic v. Allstate Ins. Co.*, 574 S.E.2d 496, 498 (N.C. App. 2002). The usual "[p]rinciples of general contract law determine whether an assignment is valid." *Id.*; *see also Charlotte-Mecklenburg Hosp. Auth. v. First of Georgia Ins. Co.*, 455 S.E.2d 655, 657 (N.C. 1995) (assignment required patient/signatory to assist in collecting and paying over proceeds to hospital, which served to "alleviate any doubt that her assignment required the [insurer] to pay the assigned money to the [hospital]").

Here, this court can readily determine that the assignments were effective[3] based on the documents submitted by both parties. The first assignment occurred before Ms. Napoleon received medical care from Bio-Medical, and the second preceded her change to a home-dialysis regime, which also was provided by Bio-Medical. At the time of assignment, the assignor's "rights were fully extinguished so that if it later received proceeds of the assigned right it held them in constructive trust for the assignee." *In re Anchorage Nautical Tours, Inc.,* 102 B.R. 741, 744 (9th

---

[3] The court acknowledges that procedurally, it may not be necessary for this court to consider the validity of the assignments, because the North Carolina state court may have already done so when it granted partial summary judgment to Bio-Medical on its state law breach of contract claim against the debtors. In their state court complaint, Bio-Medical alleged that "Deidra Napoleon entered into written *contracts* with Bio-Medical whereby she agreed to pay the facility directly for her dialysis treatments and agreed to submit the insurance proceeds she received directly to the facility. Lindsey Napoleon agreed to and confirmed these *contracts* by accepting the checks from Anthem BCBS and transferring several of them to Bio-Medical on behalf of Deidra Napoleon." Complaint, ¶ 23.

In its order entered on February 5, 2014, the state court granted partial summary judgment to Bio-Medical after determining that its complaint stated "a valid claim against the [debtors] for breach of contract; that there was a contract between the parties; that [debtors] breached the terms of the contract; [and] that [debtors'] debt to [Bio-Medical] is $29,897.83 for dialysis services rendered." Bio-Medical Objection, Ex. C (Partial Summary Judgment Order). Because the state court order refers to a breach of *contract*, rather than contracts, it is possible that the state court was referring to a contract to pay for treatments rather than a contract to submit the insurance payments pursuant to the assignments. For that reason, this court will independently consider and determine the question of the validity of the assignments.

Cir. B.A.P. 1989). Significantly, "bankruptcy does not change this result. Under the general rule, when an assignment of insurance proceeds occurs before bankruptcy and the proceeds are received after bankruptcy, the funds are the property of the assignee, not property of the estate." *In re Harbour*, 801 F.2d 394, *1-2 (4th Cir. 1986) (unpublished disposition) (citing cases).

The debtors offer no basis upon which they could assert a legal or equitable interest in the reimbursement proceeds, beyond Mr. Napoleon pointing out the checks were made out to him: This, however, is reflective only of Anthem's administrative protocol, which is to send reimbursement payments to the policy holder rather than to out-of-network providers. The legislative history to § 541 addresses this scenario quite plainly:

> Section 541 will not apply in those instances where property which ostensibly belongs to the debtor is, in reality, held by the debtor in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance and the insurance company had sent payment of the bills to the debtor before the debtor had paid the bill for which the payment was reimbursement, the payment would actually be held in constructive trust for the person to whom the bill was owed. The payment would not, therefore, become property of the estate pursuant to section 541.

*In re Moskowitz*, 14 B.R. 677, 680 (Bankr. S.D.N.Y. 1981), quoting 4 *Collier on Bankruptcy* ¶ 541.01, pp. 541-7 (relying on legislative history derived from House and Senate Reports from 95th Congress); *see also In re Stafford*, 2011 WL 10894608 (Bankr. W.D.N.C. 2011) (applying North Carolina law and finding that debtors held insurance proceeds in constructive trust for builder pursuant to an "insurance account disbursement agreement").

Finally, the court is persuaded by the helpful and extremely thorough analysis set out by Judge Whitley in *In re Helms*, 467 B.R. 374 (Bankr. W.D.N.C. 2012). In *Helms*, the chapter 7 debtors retained a general contractor, Belfor, to rebuild a home they owned as tenants by the entirety after the home was destroyed by fire. The debtors' agreement with Belfor was set out in two

9

documents. The first was a "Work Authorization," which authorized Belfor to provide the work, materials, and equipment to rebuild the home. The Work Authorization was signed by the male debtor (but not the female), and included an assignment provision purporting to transfer to Belfor "all of the homeowners' right, title and interest in insurance proceeds" anticipated from their homeowners insurance carrier. *Id.* at 377. The second was the "Construction Contract," wherein Belfor agreed to furnish "all labor, materials, tools, and equipment in order to repair the Residence" and the debtors agreed to pay Belfor the sum of $217,981.72. Both of the debtors signed the Construction Contract. *Id.* at 378.

In July 2008, the debtors received $266,363 from their insurance carrier on account of their claim. Reconstruction of the home was completed the following month, in August 2008. Notwithstanding their receipt of the insurance proceeds, the debtors paid Belfor only $96,182.57 of the $217,981.72 they owed, and kept the rest. Belfor filed a claim of lien on the residence, litigation ensued, and Belfor ultimately obtained a judgment in Wake County Superior Court for the remaining amount owed to him – $113,145.30.

Among the state court's detailed findings of fact and conclusions of law were the facts that the female debtor "knew of and benefitted from the Work Authorization signed by her husband"; that the two documents together constituted the parties' contract; and that pursuant to that contract, the "insurance policy proceeds in the amount owed to [Belfor] by [the debtors] for work performed under the Contract were assigned and to be paid to [Belfor]." *Id.* at 378. The debtors did not appeal that decision, or pay Belfor. Instead, they filed a bankruptcy petition a month after entry of the judgment. They listed the insurance proceeds still in their possession ($36,651) on their Schedule B, and while the debtors didn't claim an exemption in the proceeds, the chapter 7 trustee did. Citing

10

§ 541, the trustee sought to retain the proceeds on grounds that the funds (all received pre-petition) were property of the bankruptcy estate, and argued further that the assignment of the proceeds was invalid[4] under North Carolina law, such that Belfor's interests were "subject to the Trustee's creditor powers under §§ 544(a)(1) and (2)." *Id.* at 379.

On motion for summary judgment, the bankruptcy court disagreed with the trustee on multiple grounds and held that the insurance proceeds belonged to Belfor. *Id.* at 379. First, the court held that the state court's judgment, which established that the debtors assigned the insurance proceeds to Belfor, was binding under principles of collateral estoppel on both the debtors and on the trustee as their successor in interest. Further, while that doctrine did not restrict the trustee's exercise of his avoidance powers under § 544 to the extent that he stood in the shoes of *creditors* (as opposed to the shoes of the debtors), the trustee nonetheless couldn't prevail because he was unable to demonstrate that a creditor could avoid the assignment under North Carolina state law. *Id.*

Of particular relevance to the case at bar, the *Helms* court relied on the state court finding that the debtors' assignment of insurance proceeds was effective *notwithstanding the fact that the female debtor did not sign the actual assignment in the Work Authorization*. "In substance," the bankruptcy court wrote, "the State Court determined that Sandra Helms ratified the Work Authorization by conduct, including the assignment, and then both Helmses breached the Contract." *Id.* at 384. The bankruptcy court was in full agreement, noting that the state court's conclusion was

---

[4] An additional legal wrinkle at issue in that case with respect to the efficacy of the assignment was that only the male debtor signed the assignment, but the debtors owned the home – and thus the insurance proceeds paid in consequence of its destruction – as tenants by the entireties. That issue also was resolved in favor of Belfor.

"supported by the circumstances" and that it clearly was "not a case of one spouse unilaterally conveying away the other's rights." *Id.* at 387. So, where the non-signing female debtor in *Helms* "knew of and benefitted from the Work Authorization contract signed by her husband," the bankruptcy court concluded that it was "clear that the State Judge considered Sandra Helms to have consented to, or ratified, her husband's execution of the Work Authorization, including the assignment." *Id.* This court concludes that the reasoning set out in *Helms* is equally apt, and equally applicable, in the instant case.

## II. To the extent § 541(b) applies, it excludes proceeds from bankruptcy estate

Approaching things from a different angle, Bio-Medical also points out that § 541(b)(1) specifically *excludes* from the bankruptcy estate "any power that the debtor may exercise solely for the benefit of an entity other than the debtor." This is how Bio-Medical characterizes the debtors' assignments of the health insurance proceeds to it. In response, the debtors maintain[5] that the Additional Checks are part of the estate and remain so notwithstanding § 541(b)(1). Citing *Collier on Bankruptcy*, the debtors argue that with respect to the assignment of benefits, "the power must be *solely* for the benefit of another," such that "if the power in question *may* be exercised for the benefit of another entity, but *is capable of conferring benefit on the debtor also*, it becomes property of the estate." Debtors' Mem. of Law at 1 [Docket No. 80], *quoting* 5 *Collier on Bankruptcy* ¶ 541.17 (emphasis added).

---

[5] In their response to Bio-Medical's objection, the debtors also suggested that rights exercisable under § 544 by the trustee or creditors might be implicated by their receipt of the Additional Checks. They have not otherwise advanced support for that theory, and the court will not address it further here, beyond noting that this argument also would fail for the reasons set forth in *Helms*, 467 B.R. at 385-88.

12

The debtors' expansive interpretation of § 541(b)(1) rests on two speculative, alternative factual scenarios in which the debtors "could have benefitted" from the reimbursement checks. According to the debtors, the Additional Checks issued to Mr. Napoleon by Anthem *could* have benefitted the debtors also, because "application of the checks to the liability would have reduced the outstanding balance owed by either or both spouses to Bio-Medical." *Id.* Or, "the amount owed to Bio-Medical could have been $0.00 upon receipt of the Anthem checks in the event that the debtors had been paying directly for the medical services and therefore the debtors would have had no reason to turn the negotiable instruments over to Bio-Medical." *Id.* However, both scenarios are inconsistent with and completely precluded by what the debtors already chose to do. The debtors did *not* apply the checks to the amount owed to Bio-Medical, nor did they independently pay Bio-Medical directly for medical services, such that the amount owed "could have been $0.00 ... and therefore the debtors would have had no reason to turn the negotiable instruments over to Bio-Medical." Debtors' Mem. at 1. Nor were they entitled to do so, because as discussed above, the assignments already had transferred to Bio-Medical all rights to the insurance payments. *See also, e.g., In re Justin*, 2014 WL 3373863 (Bankr. E.D. Mich. 2014) (transfer of rights to "all insurance benefits" precludes those proceeds from ever becoming property of the estate).

And, finally, the debtors advise that § 541(b)(1) "should not be utilized for a creditor to evade the distribution scheme set forth in the Bankruptcy Code." *Id.* There is no plausible basis upon which to suggest that Bio-Medical, during the course of its efforts to recover reimbursement to which it is quite plainly entitled, has sought to use § 541(b)(1) or any other measure to obtain undue benefits or gain with regard to other creditors. The reimbursement checks originally were due to Bio-Medical pursuant to the assignments executed by both debtors, and this obligation

13

subsequently was cemented by the state court's receivership order and judgment.[6]  Under these circumstances, the court believes that Bio-Medical has proceeded with all appropriate restraint.  It is not necessary for the court to engage in a weighing of equitable considerations here, but if it did so, that endeavor would not benefit the debtors.

## CONCLUSION

For the foregoing reasons, Bio-Medical's objection to exemptions is **ALLOWED**.  The two Additional Checks are the property of Bio-Medical and are not part of the bankruptcy estate.  Accordingly, counsel for the debtors is directed to convey to Bio-Medical the Additional Checks that currently are in his possession pursuant to the court's order of March 24, 2016.

In the event that the debtors receive additional reimbursement payments from Anthem in the future, based upon claims made by Bio-Medical for medical services provided to Ms. Napoleon, such reimbursement payments have been assigned to Bio-Medical and are not the property of the debtors: Accordingly, it is **FURTHER ORDERED** that upon receipt of any future additional payments, the debtors must, within five days of receipt, pay over to Bio-Medical any and all such additional payments.

## END OF DOCUMENT

---

[6] Bio-Medical also pointed out in its objection to exemptions that the parties' Agreement was intended to resolve all claims and causes of action between the parties arising prior to its execution.  However, Bio-Medical did not articulate the specific factual and legal bases upon which it contends that the Agreement would pertain to these Additional Checks; for that reason, the court will not consider the argument further.